**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JDOG FRANCHISES, LLC,

Plaintiff,

v.

NAF FAMILY GROUP INC., and
PEDRO BARNES,

Defendants.

Civil Action No.: 2:24- cv-00285

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Evan M. Goldman, Esquire
PA Attorney ID: 325447
Brett M. Buterick, Esquire
PA Attorney ID: 320884
**THE FRANCHISE FIRM LLP**
225 Wilmington West Chester Pike, Suite 200
Chadds Ford, Pennsylvania 19317
Tel: (215) 965-1553
Email: evan@thefranchisefirm.com
Email: brett@thefranchisefirm.com

Dated: January 22, 2024

**TABLE OF CONTENTS**

INTRODUCTION .......... 1

SUMMARY OF RELEVANT FACTS .......... 2

A. The Parties' Franchise Agreements .......... 3

B. The Notice of Default and Attempts to Resolve Dispute .......... 6

C. Termination of the Franchise Agreements .......... 7

LEGAL ARGUMENT .......... 8

A. JDog is Likely to Succeed on the Merits .......... 9

B. JDog Will Suffer Irreparable Harm if the Restrictive Covenants are Not Enforced .......... 14

C. A Balancing of the Hardships, and a Consideration of the Public Interest, Favors Enforcement of the Restrictive Covenants .......... 16

D. Defendants Waived the Rule 65(c) Bond Requirement .......... 18

CONCLUSION .......... 18

## I. INTRODUCTION

Defendants, NAF Family Group, Inc. ("NAF") and Pedro Barnes ("Barnes" and, with NAF, the "Defendants"), were terminated as franchisees of JDog Franchises, LLC ("Plaintiff" or "JDog") for, amongst other things, failing to pay royalties and other payments when due and owing. As discussed in more detail, below, upon receipt of a notice of default from JDog, JDog and Defendants discussed a mutual termination of the parties' franchise agreements. The proposed termination document provided by JDog made clear that, if a mutual termination was effectuated, Defendants would be required to comply with the franchise agreements' post-termination non-competition provisions. Defendants sought to strike the non-competition language from the proposed termination document, which JDog did not (and would not) accept. Notwithstanding, Defendants began operating a competitive business from the same address and in the same territory, servicing the same clients, in violation of the franchise agreements' non-competition provisions.

In unlawfully competing against JDog from the very same location/territory as their former JDog franchise, using the same confidential information upon which they operated their franchised business, Defendants have breached the post-termination obligations of their franchise agreements, causing JDog to sustain substantial and ongoing irreparable harm. JDog seeks temporary restraints and an immediate injunction: (1) enjoining Defendants from operating a competitive business in violation of their franchise agreements; and (2) requiring Defendants to assign all telephone numbers and URLs to JDog, as required by the franchise agreements.

## II. SUMMARY OF RELEVANT FACTS

**The JDog Junk Removal and Hauling System**

JDog is a nationally recognized brand offering franchise opportunities through JDog Junk Removal & Hauling throughout the United States, including in the Commonwealth of Pennsylvania. *See* Verified Complaint ("Compl.") at ¶ 9. JDog specializes in the home and commercial service industry, providing junk removal and hauling. JDog franchises exclusively to military Veterans and their families, and is known for its Military work ethic and employment of Veterans. *Id*. at ¶ 10. JDog has more than 125 open and operating franchises located throughout the United States, and currently operates in approximately thirty (30) states. *Id*. at ¶ 11.

As a result of JDog's extensive experience in the industry, JDog has developed and perfected distinctive methods and procedures for the operation of such franchised businesses using the JDog System (as defined in the Franchise Agreements), which it grants use of to franchisees pursuant to written franchise agreements. *Id*. at ¶ 12. The System consists of distinctive methods and procedures for marketing and advertising; specifically designed forms, methods, and procedures for efficient operation of the franchised business; operations manuals and training courses; and specifically designed procedures for the promotion and provision of the franchised business's services. *Id*. at ¶ 13. Under the franchise agreements, each franchisee is granted an approved territory in which the franchisee is authorized to operate. *Id*. at ¶ 14.

JDog agrees not to establish another franchised or corporate-owned Junk Hauling and Removal business within each franchisee's assigned geographic territory during the term of the franchise agreements. *Id*. at ¶ 15. In exchange, franchisees agree to comply with the system standards and pay royalties and other fees owed in connection with the operation of the franchised business. *Id*. at ¶ 16.

To induce JDog to enter into franchise agreements and to provide franchisees access to JDog's proprietary system, franchisees also agree to reasonable post-termination non-competition covenants. *Id*. at ¶ 17. The covenant is designed to protect JDog's business interests, such as:

a. JDog's customer relationships;

b. The goodwill associated with JDog's name and marks, which all franchisees acknowledge inures exclusively to JDog's benefit;

c. JDog's confidential and proprietary know-how, methods of operation, and operating system, and the competitive edge they afford JDog and its authorized franchisees; and

d. JDog's ability to refranchise the territory and thereby protect the goodwill associated with its brand in the market.

*Id*. at ¶ 18.

**<u>The Parties' Franchise Agreements</u>**

On or about November 30, 2015, JDog and Defendant, NAF Family Group, Inc., entered into a Franchise Agreement for the operation of a JDog Junk Hauling and Removal in Brunswick, Ohio (the "2015 Franchise Agreement"). *Id*. at ¶ 19; *see also id.* at Exhibit A. Defendant, Pedro Barnes, personally guaranteed the obligations of the 2015 Franchise Agreement pursuant to a "Principal Guaranty," dated November 30, 2015 (the "2015 Guaranty"). *Id*. at ¶ 20; *see also id.* at Exhibit B.

On or about April 19, 2019, JDog and Defendant, NAF Family Group, Inc., entered into a Franchise Agreement for the operation of a JDog Junk Hauling and Removal in western Cleveland, Ohio (the "2019 Franchise Agreement" and, with the 2015 Franchise Agreement, the "Franchise Agreements"). *Id*. at ¶ 21; *see also id.* at Exhibit C. Defendant, Pedro Barnes, personally guaranteed the obligations of the 2019 Franchise Agreement pursuant to a "Principal Guaranty,"

dated April 24, 2019 (the "2019 Guaranty" and, with the 2015 Guaranty, the "Guaranties"). *Id*. at ¶ 22; *see also id.* at Exhibit B.

During the term of the Franchise Agreements, JDog agreed to provide defendants with a limited license to use JDog's system and trademark in connection with the operation of two franchised businesses and to provide defendants with certain assistance, products, supplies, materials, and manuals. *Id*. at ¶ 23. More specifically, JDog provided the following training and guidance to Defendants (and Defendants' staff) during the term of the Franchise Agreements:

a. Initial training in November 2015;

b. Retraining the in February 2021;

c. Ongoing bi-weekly calls, internal communications, and franchisee attendance at franchise conventions in 2018, 2019, and 2022; and

d. Defendant Barnes was a member of JDog's franchisee advisory counsel.

*Id*. at ¶ 24. Undoubtedly, Defendants learned the junk removal and hauling business from JDog, using JDog's proprietary System, business training, operations manual, and marketing assets. *Id*. at ¶ 25. Defendants, in turn, agreed to comply with the system standards and pay royalties and other fees owed in connection with the operation of the franchised business. *Id*. at ¶ 26. More specifically, Defendants agreed to pay royalties based on all sales made in, from, or related to Defendants' JDog franchised business. *Id*. at ¶ 27.

In exchange for access to JDog's confidential and proprietary systems, and the training provided throughout the franchise term, Defendants agreed that during the term of the Franchise Agreements, and for two years after the termination thereof, Defendants would not, either directly or indirectly as principal, agent, servant, or otherwise carry on or engage in or have a financial interest in, any junk removal and/or hauling business, within the Territory (as defined in the

Franchise Agreements), within fifteen (15) miles of the Territory, or within the metropolitan area in which the Territory is situated. *Id*. at ¶ 28; *see also id*. at Exhibit A (Article 18); *see also id*. at Exhibit C (Article 18). Article 18 further provides:

> Franchisee acknowledges that by reason of the unique nature and considerable value of the Marks and the business reputation associated with Franchisor and the System, including methods of operating, format and related proprietary rights and by reason of Franchisee's knowledge of and association and experience with the System, the provisions of this Article are reasonable and commensurate for the protection of the legitimate business interests of Franchisor, its Affiliates and franchisees. Franchisor may, by written notice to Franchisee, reduce one or more of the temporal, territorial or scope of restricted activities aspects of non-competition provided in this Article.

*Id*. at ¶ 29; *see also id*. at Exhibit A (Article 18); *see also id*. at Exhibit C (Article 18). Pursuant to the Guaranties, Barnes (twice) acknowledged and agreed to be individually bound by all of the confidentiality and non-competition provisions contained in the Franchise Agreements. *Id*. at ¶ 30; *see also id*. at Exhibit B; *see also id*. at Exhibit D.

The Franchise Agreements further provided:

> **15.5 Telephone Number(s) and URL(s).** Rights to the telephone or facsimile number or numbers URL's or social media sites which are utilized in connection with the Franchised Business from time to time shall be the property of Franchisor or held by Franchisee in trust for Franchisor and, on expiration or earlier termination of this Agreement, Franchisee hereby irrevocably authorizes Franchisor to do whatever is necessary (including executing documents in the name of Franchisee) to transfer all rights to such number or numbers URL(s) or social media sites to Franchisor or an assignee of Franchisor. Further, Franchisor will itself execute similar documents if the telephone company or other entities so requests. Franchisor may require Franchisee to use only those telephone numbers, URL(s), social media accounts (i.e. facebook, linkedin, twitter, yelp, etc.) owned by Franchisor in the operation of the franchised business. If Franchisee uses any personal phone numbers, URL's, social media accounts, etc, in the operation or promotion of the franchised business, without Franchisor's prior written consent,

> such phone numbers. URL's, social media accounts and etc. shall become the property of Franchisor.

*See id*. at Exhibit A (Article 15.5); *see also id*. at Exhibit C (Article 15.5).

**<u>The Notice of Default and Attempts to Resolve Dispute</u>**

Despite being obligated to do so, pursuant to Article 6 of the Franchise Agreements, Defendants failed to pay royalties for the months of August, October, November, and December 2023. *Id*. at ¶ 31. As such, JDog issued a Notice of Default to Defendants, dated December 15, 2023, relating to the 2019 Franchise Agreement, which stated:

> Pursuant to Article 6 of the Franchise Agreement, you agreed to pay to Franchisor a royalty fee as specified in Section 6.2 on or before the third (3rd) business day of each calendar month. Despite this obligation, you have failed to remit payment to Franchisor for the royalty fees owed for the months of August, October, November and December 2023. As such, you currently have an outstanding royalty fee balance due and owing to Franchisor in the amount of Eight Thousand Dollars ($8,000.00) for royalty fees due under the Franchise Agreement (the "Outstanding Royalties"). Accordingly, this letter shall serve as notice to you that you are currently in default of the Franchise Agreement.
>
> Under Section 14.1(a) of the Franchise Agreement, your failure to make your royalty payments constitutes a material breach, and is therefore grounds for immediate termination if it is not cured within thirty (30) days from the date of this notice. Accordingly, if you do not cure failure to make your royalty payments within the next thirty (30) days by paying all Outstanding Royalties and bringing your account current, Franchisor intends to terminate the Franchise Agreement for cause.

*Id*. at ¶ 32; *see also id*. at Exhibit E. The Notice of Default was delivered to Defendants on December 19, 2023. *Id*. at ¶ 33. As such, the deadline to cure the defaults set forth in the Notice of Default was January 18, 2023. *Id*.

Upon receipt of the Notice of Default, Defendants requested a mutual termination of the Franchise Agreements. Despite having no obligation to permit a mutual termination, JDog

circulated a proposed mutual termination agreement (the "Proposed Agreement"). *Id*. at ¶ 34. The Proposed Agreement made clear that, despite terminating the Franchise Agreements, Defendants remained obligated by the non-competition provisions in the Franchise Agreements. *Id*. at ¶ 35.

In response to the Proposed Agreement, Defendants sought to strike the post-termination non-competition obligations. *Id*. at ¶ 36. This was unacceptable to Defendants. *Id*. at ¶ 37. Notwithstanding that JDog never accepted – and would never accept – these terms, Defendants began operating a competitive junk hauling and removal business. *Id*. at ¶ 38.

Specifically, Defendants began operating Major Cleanout and Demolition Services in, and near, the former Territory. *Id*. at ¶ 39. This is in direct contravention of the Franchise Agreements. *Id*. at ¶ 40.

**Termination of the Franchise Agreements**

Defendants did not cure the defaults, as set forth in the Notice of Default, on or before January 18, 2023. *Id*. at ¶ 41. A Notice of Termination was issued to Defendants, effective January 19, 2023, relating to the 2019 Franchise Agreement, which had the effect of terminating the 2019 Franchise Agreement (the "2019 Notice of Termination"). *Id*. at ¶ 42; *see also id*. at Exhibit F.

Pursuant to Section 14.2 of the Franchise Agreements, a default (or termination) of one franchise agreement permits the default (and/or termination) of the other franchise agreement. *Id*. at ¶ 43. As such, on January 19, 2023, after issuing the 2019 Notice of Default, JDog issued a second Notice of Termination to Defendants, relating to the 2015 Franchise Agreement (the "2015 Notice of Termination" and with the 2019 Notice of Termination, the "Notices of Termination"). *Id*. at ¶ 44; *see also id*. at Exhibit G.

As of the date of the Notices of Termination, the outstanding balance for royalties due and owing is $7,897 for the 2015 Franchise Agreement and $9,875 for the 2019 Franchise Agreement. *Id*. at ¶ 45. Pursuant to Section 14.5 of the Franchise Agreements, JDog is entitled to claim and recover damages to include the loss of the benefit of JDog's bargain under the Franchise Agreements. *Id*. at ¶ 46. JDog, at all times, has fully performed all of its obligations under the Franchise Agreements. *Id*. at ¶ 50.

## III. LEGAL ARGUMENT

When determining whether to grant injunctive relief, this Court should be guided by the four-prong analysis set forth by the United States Supreme Court in *Winter v. NRDC*, 555 U.S. 7 (2008). Under the *Winter* test, a party seeking a preliminary injunction must show: (a) irreparable harm in the absence of preliminary relief; (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation; (c) that the balance of equities tips in the moving party's favor; and (d) that an injunction is in the public interest. *See S.I. Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir. 1985); *see also Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (stating that the party seeking injunctive relief must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."); *see also S&R Corp. v. Jiffy Lube Int'l Inc.*, 968 F.2d 371 (3d Cir. 1992) (enforcing the same standards in deciding a preliminary injunction); *see also 7-Eleven, Inc. v. Upadhyaya*, 926 F. Supp. 2d 614, 625 (E.D.Pa. 2013) (enforcing the same standards in deciding a preliminary injunction); *see also John G. Bryant Co., Inc. v. Sling Testing & Repair*, 369 A.2d 1164 (Pa. 1977); *see also Felmlee v. Lockett*, 466 Pa. 1 (1976).

As set forth below, JDog (1) suffers irreparable harm in the absence of injunctive relief and (2) has a likelihood of success on the merits. (3) The balance of equities tips in Plaintiff's favor because any harm brought on by the requested relief is self-inflicted by Defendants' wrongful acts and omissions. Finally, (4) an injunction is in the public interest to enforce legitimate restrictive covenants. *See*, *e.g.*, *Novus Franchising, Inc. v. Taylor*, 795 F. Supp. 122, 127 (M.D. Pa. 1992).

### A. JDog is Likely to Succeed on the Merits

A restrictive covenant will be upheld where; (a) the covenant relates to either a contract for sale or goodwill or other subject property; (b) the covenant is supported by adequate consideration; and (c) the scope of the covenant is reasonable in both time and term. *Piercing Pagoda, Inc. v. Hoffner*, 351 A. 2d 207,210 (1976); *see also Novus Franchising*, 795 F. Supp. at 127 (adopting the Piercing Pagoda test).

In *Piercing Pagoda*, plaintiff franchisor and defendant franchisee entered into several franchise agreements under which defendant was granted the right to operate several ear piercing and earring shops. The franchise agreement at issue in *Piercing Pagoda* contained a restrictive covenant, under which defendant agreed that, for the three-year period following the termination of the franchise agreement, he would not own, operate or participate in any other earring or ear-piercing business within 30 miles of any existing Piercing Pagoda location or within one mile of his former Piercing Pagoda location. *Id*. at 209. Defendant later terminated the franchise agreement and began to operate an ear-piercing shop within ten-to-fifteen miles of plaintiffs Piercing Pagoda location. Plaintiff sued to enforce the restrictive covenant and, on appeal, the Pennsylvania Supreme Court found the restrictive covenant valid. *Id*. at 210-213.

First, the court found that plaintiff had a protectable interest in the sale of its franchise to defendant, and that the covenant was supported by adequate consideration:

> The franchise agreement provided a service which [ defendant] received ... an opening line of inventory; basic training in the fundamentals of ear piercing; directions for market development; the use of a corporate name that carried with it some degree of identity in the Eastern part of Pennsylvania; and an exclusive right to sell the product in an exclusive area.

*Id*. at 211. The court concluded that:

> By the use of the franchisor's name and ability the franchisees availed themselves of the beneficial provisions of the franchise contract. In doing so, they made use of the franchisor's name which the law recognizes as a protectable interest. . The existing franchise itself is a legitimate business interest and therefore protectable.

*Id*. (emphasis added); *see also Novus Franchising*, 795 F. Supp. at 127-128.

The court next addressed the issue of whether the covenant was reasonable. The court explained that a franchise agreement restrictive covenant will be upheld where the restrictions are reasonably necessary to protect the franchisor without imposing undue burden on the franchisee, and where the restrictions are reasonably limited as to time and geographical extent. *Id.* at 212 ("The covenant faces the economic reality that continued operation of the appellants' stores subsequent to the termination of the agreement would adversely affect the ability of the franchisor to secure another franchisee in the same territory.").

The *Piercing Pagoda* court found the 30 mile - three year/one year restriction reasonable:

> This is not a covenant which restricts the ability of the [defendants] to pursue their business interests in areas other than that limited area around [plaintiffs] existing Piercing Pagoda operation and the five franchise sites given to [defendants] under the original franchise agreement . . The covenant in this case is reasonably limited since it is within such territory and during such time as may be reasonably necessary for the protection of the franchisor without imposing undue burden on the franchisee.

*Id*. at 213. More recently, in *Soft Pretzel Franchise Systems, Inc. v. Taralli, Inc.*, this Court upheld a similar non-compete, holding:

> Defendants are currently violating the covenant by operating a business similar to SPF's in the same location where Defendants previously operated an SPF franchise. Although Defendants changed the name of the business to "Marlton Soft Pretzel" and have expanded their product offerings beyond what is offered at an SPF franchise, Defendants are still operating a business that is similar to SPF's business because they are still primarily selling pretzels. This is a direct violation of the non-competition provision in the Franchise Agreement. Moreover, Defendants are still making pretzels as if they were an SPF franchise: using SPF's proprietary pretzel stringing machine and SPF's recipes. Based on these reasons, we find that SPF has demonstrated a reasonable probability of succeeding on its claim that Defendants have violated the non-competition provision in the Franchise Agreement.

*Soft Pretzel Franchise Systems, Inc.*, 2013 WL 5525015 (E.D. Pa. Oct. 4, 2013). Adopting the Court's decision in *Soft Pretzel Franchise Systems, Inc.*, the Court in *Our Town v. Rosseau* recently issued injunctive relief against the former franchisee, finding that:

> In sum, the Court finds that Our Town is likely to succeed in showing that the Defendants breached the Franchise Agreement by engaging in conduct that the Contract plainly prohibits specifically, operating a similar competing magazine within Morris County.

*Our Town*, 2017 WL 34698 (E.D. Pa. Jan. 3, 2017); *see also Lice Lifters Franchising, LLC v. Lice Lifters of Harrisburg, LLC, et al.*, C.A. 17-cv-1805-MSG (E.D. Pa. April 21, 2017) (entering a temporary restraining order against franchisee seeking to avoid post-termination non-competition obligations).

In *Dunkin' Donuts Franchising, LLC v. Claudia A I, LLC*, this Court enforced a two-year, post-termination non-compete:

> I find this covenant to be enforceable under Pennsylvania law. The franchise agreement is a contract supported by consideration on both sides, and it relates to the sale of goodwill. *Athlete's Foot Mktg. Assocs. v. Zell Inv., Inc.*, 2000 WL 426186, at *9-10 (W.D. Pa. Feb.17, 2000) (upholding a franchise's covenant not to compete)

> (*citing Piercing Pagoda*, 351 A.2d at 210). Its time limitation of twenty four months is reasonably limited. The geographical scope-"five miles from the Store or any other Dunkin' Donuts or Baskin-Robbins store that is open or under development"-does give me some hesitation. Dunkin' operates throughout the United States and has franchises abroad. *Boulanger v. Dunkin' Donuts, Inc.*, 442 Mass. 635, 644, 815 N.E.2d 572, 580 (2004). The covenant not to compete therefore seems to apply anywhere Dunkin' operates worldwide. However, the restriction's limit to a five mile radius, and the absence of any other evidence before me that this covenant is unduly burdensome, lead me to the conclusion that the covenant not to compete is reasonable and enforceable.

*Dunkin' Donuts Franchising*, LLC, 2014 WL 5343724 at *11. These same considerations should support this Court's enforcement of the fifteen-mile – two-year restrictive covenant contained in Defendants' Franchise Agreements, which provides:

> **18. NON-COMPETITION.**
> Except as expressly permitted by this Agreement or by any other written agreement between Franchisor and Franchisee, during the currency of this agreement and for a period of 24 months after expiration of the Term or an exercised Renewal Term or earlier termination of this Agreement, Franchisee shall not:
>
> (a) directly or indirectly,
> (b) in any capacity whatsoever,
> (c) either alone or in any relationship with any other person, firm, corporation or other business
> organization,
> (d) as an employee, consultant, principal, agent, member, partner, shareholder, investor, lender, director, officer, guarantor, indemnitor, credit holder, supplier, landlord or sub landlord,
> (e) within the Territory,
> (f) within a 15 mile radius of the territory of any Franchised Business of the System (including one owned by Franchisor or one of its Affiliates) which is in existence at the date of expiration or sooner termination of this Agreement, and
> (g) within the metropolitan area in which the Territory is situated, more particularly described in Schedule A, compete with the System (or any similar system owned by Franchisor or its Affiliates) or
> (i) carry on, engage or be financially concerned or interested in, or
> (ii) advise, supervise, manage, supply, loan money to or guarantee or indemnify the duties or obligations of any other person, firm, corporation or other entity engaged in or concerned with or

> interested in any business engaging in any enterprise similar in nature to the System, or offering for sale any products similar to the Services. This Article shall also continue to apply to Franchisee in the case of any assignment of this Agreement or any sale of the Franchised Business or transfer or allotment of shares of Franchisee. This Article shall survive the expiration or sooner termination of this Agreement and any assignment, transfer or sale hereunder. Franchisee acknowledges that by reason of the unique nature and considerable value of the Marks and the business reputation associated with Franchisor and the System, including methods of operating, format and related proprietary rights and by reason of Franchisee's knowledge of and association and experience with the System, the provisions of this Article are reasonable and commensurate for the protection of the legitimate business interests of Franchisor, its Affiliates and franchisees. Franchisor may, by written notice to Franchisee, reduce one or more of the temporal, territorial or scope of restricted activities aspects of non-competition provided in this Article.

*See* Compl. at Exhibits A and C (Article 18).

First, the covenant here is related to the sale of a protectable interest and was supported by adequate consideration. JDog provided Defendants with a training program; continuing advisory assistance; specifications regarding inventory, supplies, equipment and interior and exterior signs; a confidential operating manual; and the use of JDog's trade names, trademarks and service marks and trade dress. *See* Compl. at ¶¶ 18(a) – (d); *see also Piercing Pagoda*, 795 F. Supp. at 210.

Next, the covenant is reasonable in both time and geographic scope. Under the Franchise Agreements, Defendants agreed that for a two-year period following the termination of the Franchise Agreements, they would not engage in any junk removing and hauling business from, or within fifteen miles of, the approved Territory. This covenant is valid under the *Piercing Pagoda* test, as it is "within such territory and during such time as may be reasonably necessary for [JDog's] protection without imposing undue hardship" on defendants. *Id*. at 213. Defendants are free to pursue other business interests, and may operate a business similar to their former JDog business in areas other than the limited fifteen mile radius surrounding their former franchised territory and

location, or any other franchise territory granted by JDog. *See Novus Franchising*, 795 F. Supp. at 128 (restrictive covenant providing that former franchisee "not engage in a business which competes with the franchisor for a period of two years in the former franchise territories" held valid).

**B. <u>JDog Will Suffer Irreparable Harm if the Restrictive Covenants are Not Enforced</u>**

In *Novus Franchising*, Judge Rambo found that the former franchisee's violations of the franchise agreement's restrictive covenant would cause irreparable harm to the franchisor:

> Irreparable harm may be present where the franchisor/franchisee relationship is about to break up: 'The purpose of the covenant is to protect against loss of control of reputation, loss of goodwill, and customer confusion. In general, the courts have held these are sufficient grounds for a finding of irreparable injury.' ... [A] competing former franchisee, which had 'gained knowledge and experience from the franchisor' and could use this knowledge and experience to 'serve former or potential customers of the franchisor' would work a severe prejudice on the franchisor which would be difficult to measure through money damages.

*Id*. at 130 (quoting *Economou v. Physicians Weight Loss Centers of America, Inc.*, 756 F. Supp. 1024 (N.D. Ohio 1991) (emphasis added)).

A company's "loss of reputation, good will, and business opportunities" from a breach of contract are sufficient to demonstrate irreparable harm. *Register.com, Inc. v. Verio, Inc.*, 356 F. 3d 393, 404 (2d Cir. 2004). Although not readily defined, goodwill has often been described as the "expectancy of continued patronage[.]" *Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*, 2011 WL 497978, *6 (S.D.N.Y. Feb. 11, 2011); *Gen. Cigar Co., Inc., v. G.D.M. Inc.*, 988 F. Supp. 647, 659 (S.D.N.Y. 1997) (goodwill is defined as the "value attributable to a going concern apart from its physical assets—the intangible worth of buyer momentum emanating from the reputation and integrity earned by the company"); *Nat'l Elevator Cab & Door Co. v. H & B, Inc.,* 2008 WL

207843, *5 (E.D.N.Y. Jan. 24, 2008) (goodwill "typically includes not only the likelihood that customers will return to the old place of business, but the competitive advantage of an established business"), *aff'd*, 282 Fed. Appx. 885 (2d Cir. June 27, 2008). It follows that when a party violates a non-competition clause, "the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,* 323 F. Supp. 2d 525, 532 (S.D.N.Y. Sept. 17, 1999)).

Courts also recognize the danger that "former franchisees will use the knowledge that they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the good will of the franchisor." *ServiceMaster Residential/Commercial Serv., L.P. v. Westchester Cleaning Serv., Inc.*, 2001 U.S. Dist. LEXIS 4807, at *9-10 (S.D.N.Y. Apr. 19, 2001). "Generally, when a party violates a [reasonable] non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm" for purposes of imposing a preliminary injunction. *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,* 323 F. Supp. 2d 525, 532 (S.D.N.Y.2004) (citing cases); *see also Ticor Title,* 173 F.3d at 69 (It is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client.").

In cases involving competing businesses offered by a former franchisee, the "potential harm . . . arises from Defendant's ability to trade on the knowledge and customer relationships gained as a . . . franchise, which impacts on Plaintiff's good will and its interest in re-franchising the market." *Id.* at *13. Other courts have cited this very same concern in finding that franchisors—such as JDog, here—would suffer irreparable harm from a competing business operated by a former franchisee. *NaturaLawn of Am., Inc. v. West Group, LLC*, 484 F. Supp. 2d 392, 402 (D. Md. 2007) (recognizing the real danger that a franchisor seeking injunctive relief could be

"permanently shut out of the market in the counties at issue because few if any prospective franchisees will agree to step into the relevant market"); *Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*, 834 F. Supp. 683, 692 (D.N.J. 1993) (without a grant of injunctive relief, a franchisor's good will would be harmed by the existence of a competing business at the very site of the former franchise, and that because customers are likely to patronize businesses close to home or work, the operation of a competing business in the area would greatly impair plaintiff's ability to establish another franchise in the same area).

The same is true here. The purpose of the Franchise Agreements' restrictive covenant is to protect JDog against loss of reputation, damage to its goodwill, and customer confusion which may result should Defendants continue to operate a junk hauling and removal business from the formerly-franchise territory, especially if permitted to utilize identical contact information. Defendants have gained valuable knowledge and experience from JDog during their tenure with JDog. To permit Defendants to use this knowledge and experience to continue to service JDog's former and potential customers would irreparably harm to JDog. *Id*. "Although some of [JDog's] damages may be measurable in monetary terms, others -- such as [loss of] goodwill, are too nebulous to ascertain." *Id*. at 131.

### C. A Balancing of the Hardships, and a Consideration of the Public Interest, Favors Enforcement of the Restrictive Covenants

JDog has a protectable interest in re-franchising Defendants' area and in protecting its goodwill, reputation and customers. *See Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*, 834 F. Supp. 683, 691 (D.N.J. 1993) (noting that the franchisor "has an interest in being able to place a new franchisee at or near the same locations where this good will has been created"). While Defendants may suffer monetary harm as a result of the enforcement of the restrictive covenant, their self-

inflicted harm is outweighed by the irreparable harm JDog will suffer should an injunction not issue. *Id*. at 130-131.

JDog is merely attempting to enforce the benefit of its bargain with Defendants as contained in the Franchise Agreements. By executing the Franchise Agreements, Defendants agreed to be bound by the restrictive covenant. Defendants cannot now complain of the burden imposed by the restrictive covenant, as Defendants brought such burden upon themselves by breaching the Franchise Agreement. Worse yet, here, Defendants were fully aware of the non-competition obligations prior to violating same, in that Defendants *tried* to remove the obligations from the Proposed Agreement. Thus, Defendants cannot feign surprise of the import of the obligations. Generally, enforcement of a non-competition agreement within reasonable parameters is "consistent with the public interest in upholding reasonable contractual undertakings and protecting the value of franchises." *Mr. Softee, Inc. v. Tsirkos*, 2014 WL 2535114, at *10 (S.D.N.Y. June 5, 2014); *JTH Tax, Inc. v. Sawhney*, 2019 WL 3051760, at *7 (S.D.N.Y. July 11, 2019) ("Injunctive relief would serve the public interest by ensuring that reasonable restrictive covenants into which the parties voluntarily entered are enforced and protecting Plaintiffs' legitimate interests in maintaining the value of their business relationships.").

Further, where the harm imposed on a party by the issuance of preliminary relief is brought upon that party by its own unlawful behavior, such harm should be discounted in the permanent injunction analysis. *See Opticians Ass'n v. Independent Opticians*, 920 F .2d 187, 197 (3d Cir. 1990).

Finally, enforcing the restrictive covenant is in the public interest. As stated by the court in Novus Franchising:

> [h]igh courts in Pennsylvania ... have determined ... that protecting the interests in goodwill of employers and franchisors as embodied

> in non-competition clauses outweighs [the argument that restrictive covenants restrict freedom of competition]. This court will follow that long-established line of authority [ and enforce the restrictive covenant].

*Id*. at 132.

**D. Defendants Waived the Rule 65(c) Bond Requirement**

The amount of posting of security upon issuance of a temporary restraining order or preliminary injunction is vested in the Court's sound discretion. *See* Fed. R. Civ. P. 65. Defendants agreed, in Section 19.17 of the Franchise Agreements, to waive the bond requirement. As such, JDog should not be required to post bond, especially because this motion is unlikely to result in wrongful enjoinment.

## IV. CONCLUSION

For the foregoing reasons, JDog respectfully requests that its motion for a temporary restraining order and preliminary injunction be granted in the form of the proposed orders.

Dated: January 22, 2024
Chadds Ford, Pennsylvania

THE FRANCHISE FIRM LLP

*/s/ Evan M. Goldman*

Evan M. Goldman, Esquire
225 Wilmington West Chester Pike
Suite 200
Chadds Ford, Pennsylvania 19317
Tel: 215-965-1553

*Attorneys for Plaintiff*